IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-02286-JLK

THE ESTATE OF ANGEL PLACE, Represented by Shane Place and Misty Blackwell,
Personal Representatives,

      Plaintiff,

v.

JOYCE ANDERSON,
JONI BEDELL, and
CRYSTAL STEWART,

      Defendants.

---

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (ECF No. 66)**

---

Kane, J.

## INTRODUCTION

This civil action involves the death of Angel Place ("Angel") on September 17, 2014,
when she was 11 months old and a foster child under the care of foster parents Randy Bond and
Sydney White. Angel died after having been shaken and kicked violently by Sydney White.
Plaintiff seeks damages against three social workers employed by the Mesa County Department
of Human Services.

The operative complaint is the Second Amended Complaint. (ECF No. 73).

## JURISDICTION

Jurisdiction is provided by 28 U.S.C. §§ 1331 & 1343(a)(3).

## PARTIES

The plaintiff is the Estate of Angel Place, represented by Shane Place and Misty Blackwell, personal representatives. Shane Place is Angel Place's paternal grandfather. He was appointed personal representative of the Estate on October 22, 2016, in the state court probate proceeding captioned *In the Matter of the Estate of Angel Place*, Case No. 16PR30293, in the District Court for Mesa County, Colorado. Ms. Blackwell was appointed co-personal representative of the Estate on September 26, 2018.

The defendants are Joyce Anderson, Joni Bedell, and Crystal Stewart. They are sued in their individual capacities and in their official capacities as employees of the Mesa County Department of Human Services.

Plaintiff's claims against defendant Jacque Berry were dismissed by stipulation. *See* Stipulated motion to dismiss (ECF No. 80) and Order dated March 28, 2019 (ECF No. 81).

## CLAIMS

Plaintiff asserts three claims for relief pursuant to 42 U.S.C. § 1983.

Plaintiff's first and second claims allege that Defendants violated Angel's right to Substantive Due Process guaranteed by the Fourteenth Amendment to the United States Constitution. As discussed below, claim one is premised on the "special relationship doctrine," and claim two is premised on the "state-created danger theory."

The third claim alleges violations of the Adoption Assistance and Child Welfare Act of 1980 (AACWA), 42 U.S.C. § 670 et seq.[1]

---

[1]The complaint does not state that the third claim for alleged violations of the AACWA is premised on 42 U.S.C. § 1983, but Plaintiff's response brief makes that clarification. (*See* ECF No. 74, Pl.'s resp. at p. 59).

The fourth claim for violation of the Child Abuse Prevention and Treatment Act, 42 U.S.C. § 5106a et seq., was dismissed by stipulation. *See* Stipulated motion to dismiss (ECF No. 80) and Order dated March 28, 2019 (ECF No. 81).

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 66)**

On January 9, 2019, Defendants moved pursuant to Fed. R. Civ. P. 56 for dismissal of all claims, arguing (1) the doctrine of qualified immunity shields them from liability in their individual capacities; (2) the first and second claims fail on the ground that Plaintiff's evidence is not sufficient to show a substantive Due Process violation under either the special relationship or state-created danger theory; and (3) the third claim fails because the subject provisions of the AACWA do not provide rights enforceable under § 1983, or if they do, the available relief is limited to injunctive relief.

Defendants' motion is supported by documents, deposition testimony, and other evidence identified as Defendants' Exhibits A-1 through A-22 (ECF Nos. 66-1 through 66-47).

Plaintiff opposed the motion in a response filed February 15, 2019 (ECF No. 74). Plaintiff supported its response with exhibits marked as Plaintiff's Exhibits 1 through 32 (ECF Nos. 74-1 through 74-32).

Defendants replied on March 15, 2019, and provided additional documents marked as Defendants' Exhibits A-23 through A-28-1 (ECF Nos. 78 and 78-1 though 78-7).

Plaintiff was granted leave to file a sur-reply, which was filed on May 1, 2019 (ECF No. 86).

# FACTS

Defendants' motion includes a statement of undisputed facts, but that statement is set forth in narrative form and not in numbered paragraphs. (Defs.' mot. at pp. 3-12). Plaintiff's opposition brief does not admit or deny Defendants' statement of undisputed facts. Instead, Plaintiff provides its own statement of facts in narrative form. (Pl.'s resp. at pp. 2 - 22). Both parties include argument with their version of the facts.

Below is my own effort to describe the factual background without the parties' argumentative statements. I drew the following statement of facts from exhibits and the parties' descriptions of the background facts.

The underlying material facts appear to be generally undisputed. There are, however, disputes about inferences to be drawn from the facts. Those disputes are identified in the discussion below.

## Angel enters foster care

Angel Place (Angel) was born on October 6, 2013 to parents Tierra Bond Place (age 16) and Theodore Place (age 19). In late November 2013, the Mesa County Department of Human Services (MCDHS) received a report of safety concerns about Angel. An MCDHS case manager, Jacque Berry, investigated that report. She determined that the biological parents were physically and verbally abusive toward each other, using marijuana, neglecting Angel, and the home was unsafe for Angel. (Pl.'s Ex. 1, Request to File Petition in Dependency and Neglect). The MCDHS obtained custody and removed Angel from her biological parents' home on December 6, 2013, pursuant to an emergency court order in a state court action captioned *In the Interest of Angel Lanee Place, a minor child, and concerning Tierra Sue Place and Theodore Elvin Place,*

Case No. 13 JV 410, District Court for Mesa County, Colorado (the Juvenile Court Action). (Pl.'s Ex. 2, Emergency Custody and Pickup Order).

### Angel is placed with foster mother Misty Blackwell

The MCDHS initially placed Angel with foster parent Misty Blackwell. An organization known as Ariel Services had certified Ms. Blackwell to be a foster parent, and Ariel Services referred Ms. Blackwell to the MCDHS. Cassandra Strang, an Ariel Services caseworker, monitored Angel's placement with Ms. Blackwell and reported to the MCDHS. (Defs.' Ex. A-3, M. Blackwell Dep. at 19:6-18; Defs.' Ex. A-4, Strang Dep.)[2]

Ms. Blackwell was a good foster mother who provided a safe home for Angel. (Defs.' Ex. A-5, Stewart Dep. at 66:1-9). By all accounts, Angel was healthy, comfortable, and well-adjusted under her care.[3]

### The MCDHS considers kinship placement

Ms. Blackwell was not related to Angel. According to Colorado and federal law, the

_____

[2]Cassandra Strang is now known as Cassandra O'Brien. I use the surname "Strang" when referring to her and the term "Strang/O'Brien Dep." when referring to her deposition testimony, found at Defendants' Exhibit A-4.

[3]Before this litigation, Defendants never contended that Ms. Blackwell was not a suitable foster parent for Angel. Nevertheless, Defendants's reply poses a "reverse **hypothetical** situation," asserting that the judgment of the MCDHS could have been second-guessed if Angel had stayed with Ms. Blackwell and had died while under her care. To support that argument, Defendants' reply includes - for the first time - disparaging information about Ms. Blackwell's health history, communications with a newspaper reporter, and a letter that Ms. Blackwell wrote to Randy Bond and Sydney White in 2014. (Defs.' reply, ECF No. 78, at pp. 17-19). In a sur-reply, Plaintiff accuses Defendants of making an after-the-fact attack on her suitability as a foster parent. (Pl.'s sur-reply, ECF No. 86, at pp. 2-4). In my view, Defendants' argument about a "reverse hypothetical situation" is irrelevant, and for the purpose of determining the legal issues presented by Defendants' motion for summary judgment, I have disregarded Defendants' argument about a "reverse hypothetical."

MCDHS was required to engage in a diligent search for a kinship foster home. *See* 42 U.S.C. §671(a)(19); C.R.S. § 19-3-403; C.R.S. § 19-3-508(5)(b)(I); C.R.S. § 19-3-605(1); C.R.S. § 19-1-115(1) & (3)(a). The MCDHS manual for the Family and Children Services Division includes the following statement: "The State Department of Human Services Mandates that children be placed with kin when kin are determined to be safe and appropriate, and that a diligent search process to locate kin begin within 3 days of placement and continue until a permanent placement plan is reached." (Pl.'s Ex. 10, MCDHS Kinship Care Policy and Procedure).

The MCDHS began that search in early December 2013. By the end of that month, a young couple, Mr. Randy Bond (Randy) and Ms. Sydney White (Sydney), were identified as potential kinship foster parents. (Def.'s Ex. A-6-1, Kinship Diligent Search Referral Form).[4] Randy is a first cousin of Angel's biological mother, Tierra Bond Place.

Randy and Sydney had lived together as common law husband and wife for approximately four years. Randy was then 21 years old, and Sydney was almost 20 years old. They were the parents of two children – a son (Kaleb) who was then just over 2 years old, and daughter (Harper) who was under the age of 1. Randy and Sydney expressed their desire to provide Angel with a loving home. (Defs.' Ex. A-6-5, Home Study at MC-2017).[5]

---

[4]I refer to Randy Bond as "Randy" and Sydney White as "Sydney" to avoid confusion with other relatives with the last names of Bond and White. Randy and Sydney's household is referred to as "the Bond/White household."

[5]A page reference such as MC-2017 in this memo refers to that page of a document bearing the bates number Mesa County-002017. For the sake of brevity, I have used the abbreviation "MC" for "Mesa County" and "MD" for "Mesa Defendants" in the bates numbering system.

During the relevant time period, Defendant Joni Bedell was a supervisor employed by the MCDHS.

An MCDHS caseworker, Ethan Storeng, initiated the process to certify Randy and Sydney as foster parents by sending an email to Bedell, requesting a Safe Home Study of Randy and Sydney. (Defs.' Ex. A-6-2, Jan. 30, 2014 email from Storeng to Bedell).

A Safe Home Study is an industry standard used by state and county agencies to assess and approve potential foster parents. It is a detailed report that includes information such as criminal background checks; reference checks; medical reports regarding the applicants; interviews with the applicants and members of their household; and other documents. (Def.'s Ex. A-6-4, part 1 at MD 44110).

Defendant Bedell assigned the task of conducting the Safe Home Study of the Bond/White household to defendant Joyce Anderson, an MCDHS Placement Resource Manager.

Connie Mercer, another placement resource manager, also was involved in the process of certifying the Bond/White household to become a foster home. Ms. Mercer was responsible for matters such as ensuring that the applicants' home met certain standards; the applicants were prepared to provide a safe environment for the foster child; and required paperwork was completed. (Pl.'s Ex. 16, Mercer Dep. 64:12-65:21; Defs.' Ex. A-9, Bedell Dep. at 34:21-36:7; 37:23-25).[6]

---

[6]Ms. Mercer is not named as a defendant.

The Certification Process and Home Study Report

To become certified as foster parents, Randy and Sydney attended a series of training classes and completed application forms. (Defs.' Ex. A-6-3, MCDHS training records; Defs.' Ex. A-6-4, part 2, Application to Care for Children).

To prepare the Home Study, Ms. Anderson assembled and reviewed various records, including criminal background checks of Randy and Sydney, social histories, documentation of their interactions with DHS, and other data. (Defs.' Ex. A-6-4, parts 1 & 2). Ms. Anderson interviewed Randy and Sydney – both individually and together – and observed them with their two children. (Defs.' Ex. A-11, Anderson Dep. at 43:8-21; 57:22-58:14). Ms. Anderson reviewed Randy's and Sydney's responses to questions on the application forms and SAFE assessments, which included detailed information about their personal lives and histories. (Defs.' Ex. A-6-4, part 1).

In the Home Study report, Ms. Anderson documented that Sydney "grew up in an extremely dysfunctional home" and experienced a difficult childhood and teen years. (Defs.' Ex. A-6-5 at MC-2032). In questionnaire responses, Sydney had disclosed that her mother had abused her emotionally and sometimes physically. (Def.'s A-6-4, part 1 at MD-4127-4128). In response to questions about whether she had been sexually abused, assaulted or molested as a child or teenager, Sydney wrote that she was uncertain. (*Id.*) Sydney's written responses also indicated that she suffered from depression and panic attacks. (*Id.* at MD-4140). The information compiled by Ms. Anderson included a Colorado Department of Human Services Child Welfare "Trails System Report" which showed that in 2010 Sydney had been a truant during her school years and assessed as a "Youth in Conflict." (Defs.' Ex. A-6-4 pt. 2 at MD-4195). The Trails

Report included statements by White's mother who said that she and Sydney had verbal and physical altercations, which included them pushing and slapping each other. (*Id.* at MD 4197).

The documents that Ms. Anderson gathered showed that Randy, too, had experienced a troubled family life during his youth. (Defs.' Ex. A-6-5 at MC-2023-2024). A Trails System Report for Randy described an incident in 2007 when it was reported that Randy's stepfather had been physically abusive to him. (Defs.' Ex. A-6-4 pt. 2 at MD-4186-4194).

In the Home Study, defendant Anderson documented that both Randy and Sydney graduated from high school, and that Sydney had graduated a year early. (Defs.' Ex. A-6-5 at MC-2023-2027). Randy was described as healthy with no medical issues. (*Id.*). Neither of them smoked or drank. (*Id.*). They appeared to be financially responsible. (Defs.' Ex. A-6-5 at MC 2030). They had recently purchased a home in Grand Junction. (*Id.* at MC-2018 & MC-2021).

Randy's and Sydney's daily routines were described in the Home Study. It showed that Randy was employed by Coca Cola as a commercial driver, and that he left for work around 5:00 a.m. and was gone much of the day, often working 50 hours a week. The Home Study stated that Sydney stayed at home with their 2-year old son and infant daughter, and was also home schooling her younger sister. (Defs.' Ex. A-6-5 at MC-2022, MC-2030).

In short, the personal history information that Ms. Anderson assembled about Randy and Sydney showed they had experienced abuse and family dysfunction during their younger years, but described Randy and Sydney as responsible parents to their own two children. (Defs.' Ex. A-6-5 at MC 20230-2031).

Information provided by Sydney and Randy indicated they argued almost daily, but there were no reports of them being physically abusive to each other or their children. (Defs.' Ex. A-6-4, part 1 at MD-4136).

A team of MCDHS workers reviewed and discussed Anderson's Home Study report. They discussed that Randy and Sydney were young parents who already had two young children. (Defs.' Ex. A-6-5 at MC 2017-2035; Defs.' Ex. A-9, Bedell Dep. at 34:21-36:7; Defs.' Ex. A-8, Storeng Dep. at 129:17-130:7).

On April 11, 2014, Ms. Bedell (Anderson's supervisor) wrote an email to Ms. Anderson and Ms. Mercer, stating in part:

> I can't make it to the co-team meeting today to discuss the Bond home study. . . . Here's my two cents.  We give preference to family unless there is extenuating circumstances that it would be detrimental to the child (i.e. breaking the attachment during critical developmental stages, which usually starts at about 9 months to 3 years of age). . . .

(Pl.'s Ex. 28, Bedell email).

Ms. Anderson concluded that Angel should be placed with Randy and Sydney. (Defs.' Ex. A-6-5 at MC-2033). Ms. Bedell concurred with that recommendation. (*Id.* at MC 2034).

When Ms. Anderson was deposed in this litigation, she testified that the reasons for her recommendation were "based on many factors and both of them (Randy and Sydney) had been living very productive lives, and they had  – their current behavior and the current lifestyle was not one of abuse." (Defs.' Ex. A-11, Anderson Dep. at 138:15-19). Ms. Anderson was aware that Sydney was only 20 years old, but viewed her as a "very mature 20." Ms. Anderson said that based on "everything (she had) observed at the time that I did the study told me that (Sydney) was mature and she was a good mom to her child(ren)." (*Id*. at 157:1-3, 157:16-18).

Defendant Crystal Stewart, an MCDHS senior case manager, was responsible for monitoring Angel's foster home placement. Her job was to focus on the child. (Defs.' Ex. A-5, Stewart Dep. at 80:1-80:14). Ms. Stewart saw Angel in Ms. Blackwell's home on May 2, 2014, and reported, "Angel is a very happy baby. She has no medical issues and is overall a healthy baby." (Pl.'s Ex. 9, Family Services Plan Review).

The position of the MCDHS remained that Angel should be placed in the Bond/White household. (*Id.*).

Because Sydney was under 21, a written waiver was required before she could be certified as a foster parent. (Pl.'s Ex. 16, Mercer Dep. at 109:15-18; 116:6-12). The MCDHS team decided that the age requirement should be waived, but the waiver was not signed until July 23, 2014. (Pl.'s Ex. 23). It was not completed on June 17, 2014, when the MCDHS recommended to the Juvenile Court that Angel be moved to the Bond/White household.

Juvenile Court Action Proceedings

Proceedings in the Juvenile Court Action had been ongoing, and Angel's biological parents had appeared through separate counsel. By court order dated January 22, 2014, Angel was adjudicated dependent or neglected as to the biological mother, and a similar order entered as to the biological father on March 13, 2014. (Pl.'s Exs. 7 & 8, Court orders). Those orders stated that the MCDHS was making "reasonable efforts to reunite the child and family" and that such efforts would continue. (*Id.*). That is, the Juvenile Court Action did not involve efforts to terminate the parental rights of the biological parents. Pursuant to the state court's orders, Angel remained in the custody of the MCDHS, in the care of Ms. Blackwell.

During the spring of 2014, the MCDHS focused on placing Angel with the Bond/White kinship family.

In late March 2014, Ms. Blackwell filed a *pro se* motion to intervene in the Juvenile Court Action, stating that she objected to any plans the MCDHS might have to change Angel's placement. (Pl.'s Ex. 2). Her motion to intervene was granted on April 22, 2018. (*Id*.).

The presiding judge in the Juvenile Court Action, Magistrate William T. McNulty, held a hearing on May 2, 2014, and set a hearing for June 17, 2014, to review the biological parents' treatment plan and to consider the proposed transfer of Angel's foster placement from Ms. Blackwell to the Bond/White household. (Defs.' Ex. A-15, Hrg.Tr. June 17, 2014 at 2:14-24).[7]

The Attachment Assessment

In preparation for the June 17, 2014 hearing, the MCDHS conducted an evaluation to assess "Angel's developmental stage and her attachment to determine whether or not Angel (could) transition into the kinship home successfully." (Pl.'s Ex. 9, Family Services Plan Review). That evaluation was done by MCDHS employee Michelle Doll, a licensed counselor with experience in making such assessments. After meetings with Ms. Blackwell and the Bond/White family, Ms. Doll prepared a written report, which was completed on June 13, 2014. (Defs.' Ex. A-6-7, Attachment Assessment).

In the Attachment Assessment, under the heading "parental strengths," Ms. Doll wrote:

---

[7]The June 17, 2014 hearing transcript was filed in seven parts, marked as Defendants' Exhibits A-15-1 through A-15-7. In this memo, references to the June 17, 2014 transcript are identified by the abbreviation "Hrg. Tr.," followed by the page and line.

> Angel's current foster mother, Misty, is consistently responsive, nurturing, and able to read Angel's cues. It is evident she is bonded to Angel. The kin family, Randy and Sydney, are gentle, are responsive, are nurturing, and demonstrate a lot of concern for Angel's needs and will modify their strategies to meet her needs. Their own children have formed secure attachments with them. Both families demonstrate age appropriate and developmentally supportive parenting strategies.

(*Id.* at MC-2532). Ms. Doll observed that Angel generally was where she needed to be developmentally, stating that Angel was behind on her gross motor skills, but socially and emotionally she was on track. (*Id.* at MC-2533). Ms. Doll concluded that placement of Angel in the Bond/White household could proceed if the transition was completed soon. (Defs.' Ex. A-6-7 at MC-2533-34; and Defs.' Ex. A-14, Doll Dep. at 21:1-2; 100:4-10; 100:15-22; 102:14-103:1; 204:25-206:4).[8]

The  June 17, 2014 Hearing

Shortly before the June 17, 2014 hearing, Ms. Blackwell consulted with attorney Trudee Andersen Gurley. On June 13, 2014, Attorney Gurley moved to continue the upcoming hearing and filed a "conditional entry of appearance," which stated that Gurley would appear for Ms. Blackwell if the court were to grant the motion for continuance. (Pl.'s Ex. 22, Intervenor's Conditional Entry of Appearance).

The court proceeded with the June 17 hearing. Attorney Gurley initially appeared with Ms. Blackwell. The County Attorney was present, with Ms. Stewart as the MCDHS representative. The biological parents were represented by their counsel. Also present were

---

[8]Dr. Frank Kunstal (Plaintiff's expert witness) criticizes Ms. Doll's attachment analysis. (Pl.'s resp. at p. 11, citing Pl.'s Ex. 12, Kunstal Dep.) That aspect of Dr. Kunstall's opinion testimony does not appear to be relevant inasmuch as Ms. Doll is not a named defendant, and Plaintiff does not contend that the named defendants should have questioned Ms. Doll's analysis.

Mr. Robert Tweedell, the court-appointed Guardian Ad Litem (GAL), and a CASA representative, Ms. Schmid. (Hrg. Tr. at 2:1-13).[9]

Magistrate McNulty began the hearing by stating that he had reviewed a number of reports, including the Home Study, and asked counsel to address the issue of a continuance.

The counsel for the biological mother objected to the continuance. The GAL expressed concern about delay. There was discussion about Ms. Blackwell's reasons for not obtaining counsel sooner. The County Attorney would agree only to a very short continuance of less than two weeks, and stated that the County's witnesses were present and ready to testify. (*Id.* at 2:14-10:5).

Magistrate McNulty denied the motion for continuance, stating that although there was some good cause for continuance, it was uncertain when a hearing could be rescheduled and the court could not find that a continuance would be in the best interest of the child, recognizing that allegations in the case involved attachment issues which needed to be resolved promptly. (*Id.* at 10:11-13:24). After the motion for continuance was denied, Attorney Gurley departed and Ms. Blackwell represented herself.

The County called Ms. Doll as its first witness, and the Attachment Assessment was admitted into evidence. (*Id.* at 19:14- 20:19; 26:14-27:10). Ms. Doll testified that Angel, then 8-months old, was in the early phases of developing attachment and was already forming a secure attachment with Ms. Blackwell. (*Id.* at 28:5-30:6; 32:6-7; 42:20-25). Ms. Doll did not make a recommendation about whether Angel should be moved from Ms. Blackwell's home to the

---

[9]CASA is an acronym for Court Appointed Special Advocate. *See* https://www.casamc.org/ CASA representatives are volunteers who serve as advocates for children involved in dependency and neglect proceedings. *Id.*

Bond/White household, but opined that any decision should be made quickly. (*Id.* at 34:13). Ms. Doll said there were risks with many moves and that multiple moves were less than ideal. (*Id.* at 49:18-51:3).

Randy Bond was the next witness. He testified about his background, employment, family, relationship to Angel, and his participation in the foster family certification process. (*Id.* at 57:19-71:5).

Ms. Place (Angel's biological mother) testified by telephone and expressed her desire to have Angel placed in the Bond/White household. (*Id.* at 71:6-75:16).

The County then called Ms. Stewart. (*Id.* at 76:20). She testified that Randy and Sydney were approved to be a licensed foster home. She opined that it was in Angel's best interest to be placed with Randy and Sydney. (*Id*. at 76:14-19; 78:24-79:1). The Home Study was admitted into evidence during questioning by counsel for the biological father. (*Id.* at 82:17-84:7).

When Ms. Stewart was asked by the County Attorney if there was anything that was not addressed that the Court should know, she responded, "I don't think so." (*Id*. at 78:16-18). Ms. Stewart did not draw attention to any information about Sydney and Randy that might have raised concerns about placing Angel with them. Ms. Stewart did not explain that the Bond/White household could not yet legally be a foster home because Sydney was under 21 and the form required to waive the minimum age standard had not been signed.

After the County presented its evidence, Ms. Blackwell called Sydney White as a witness and questioned her about the difficulties of caring for a third child and whether she had concerns about potential child abuse by Randy's mother and stepfather. (*Id*. at 90:12-99:6).[10]

Ms. Blackwell also called Cassandra Strang (the Ariel caseworker), who testified about Angel's attachment to Ms. Blackwell and Angel's healthy development under Blackwell's care. (*Id.* at 99:16-24). Another witness, Cheryl Morris, also testified about her observations of Angel's attachment to Ms. Blackwell. Blackwell's father (O'Neal Blackwell) and mother (Shirley Blackwell) testified about their relationship with Angel. (*Id.* at 108:22-121:2). Ms. Blackwell was sworn as a witness and explained why she believed Angel should not be moved from her home. (*Id.* at 121:3-127:20).

Ms. Schmid, the CASA representative, was not called to testify. When deposed in this litigation, Ms. Schmid said that she had reservations about the Bond/White household and thought Angel would be a lot safer with Ms. Blackwell. (Pl.'s Ex. 5, Schmid Dep. at 89:12-25). Ms. Schmid had expressed those concerns to the GAL before the June 17 hearing. (*Id.* at 90:1-93:9).

The GAL, however, supported the MCDHS's position that Angel should be transferred to the Bond/White kinship foster home, as did the attorneys for the biological parents. (Tr. at 131:6-135:3).

---

[10]Ms. Blackwell also tried to introduce arrest records of Randy Bond's mother and stepfather, but that evidence was not admitted. (Tr. 92:18-98-9).

At the conclusion of the hearing, Magistrate McNulty ruled that it was in Angel's best interests to be placed with the Bond/White kinship family and ordered that the transfer occur according to a transition plan to be designed by Ms. Doll. (*Id.* at 135:17-148:3).

Transition period (June 17, 2014 -July 11, 2014)

During the period from June 17, 2014 through July 10, 2014, Angel alternated between the home of Ms. Blackwell and the Bond/White household, spending more time in the kinship home each week. MCDHS employees (generally Ms. Stewart or Ms. Mercer) supervised the "handoffs" when the Blackwells brought Angel to be delivered to the Bond/White household, and when Angel was returned to Ms. Blackwell. (*See* Defs.' Ex. A-6-8 at MC 18 & MC 2369-71).

According to Ms. Blackwell, Angel always a happy baby with her, but when Angel came back from staying in the Bond/White household "she would be lost." (Pl.'s Ex. 4, Blackwell Dep. at 51:25-52:15). Ms. Blackwell described Angel at those times as "quiet and withdrawn" with "the saddest little look on her face," and said that the longer Angel was gone, the longer it took to bring her back to being happy. (*Id.*).

On the morning of July 3, 2014, Ms. Stewart supervised a handoff when Ms. Blackwell and her parents brought Angel to be delivered to the kinship family. After the handoff, the Blackwells met with Ms. Stewart and complained that the kinship family was not paying attention to Angel and not caring for her properly. Sheila Blackwell reported that Angel's ear was bleeding whenever she returned from the Bond/White household, and also complained that Sydney would not take a bag of Angel's possessions, which the Blackwells had packed for her.

(Defs.' Ex. A-6-8 at MC-993). After listening to those complaints, Ms. Stewart spoke by telephone with Sydney. (*Id.*).

Later on July 3, 2014, Ms. Mercer supervised Angel's return from the kinship foster family to Ms. Blackwell. During that transition, Sydney said she had taken Angel to the doctor because she had fluid coming out of her ear and explained the use of ear drops that the doctor had prescribed. (Defs.' Ex. A-6-8 at MC-18).

In the early evening of July 3, 2014, Ms. Blackwell called the MCDHS and reported that Angel had a bruise under her eye when she came back from the Bond/White household. (Defs.' Ex. A-6-8 at MC-995). Defendant Stewart spoke with Ms. Mercer, and Mercer said she had not noticed any mark on Angel's face. (*Id.*; Defs.' Ex. A-5, Stewart Dep. at 235:4-236:19).

Ms. Blackwell's report of suspected child abuse was referred to and investigated by the office of the Marshall of the Town of DeBeque. A Deputy Marshall observed Angel and took photographs. (Defs.' Ex. A-19, Dalley Decl.) The Mashall's report said that he observed only a very small red scratch and reddish area, which could have been made by the child's finger or rubbing. (Defs.' Ex. A-19, Dalley Decl.) He shared his report with the MCDHS. (*Id.*).

Ms. Blackwell told the Ariel caseworker (Cassandra Strang) about the bruise incident and sent photos of Angel's face to Ms. Strang,. Ms. Strang and Ms. Stewart communicated by email, and agreed that neither one of them could see any marks. (Defs.'Ex. A-4, Strang/O'Brien Dep. at 123:6-124:10).

Ms. Mercer supervised another handoff on July 7, 2014, when Ms. Blackwell's father brought Angel to be delivered to Sydney. (Defs.' Ex. A-6-8 at MC-18). Ms. Mercer did not see any evidence of marks or bruising on Angel's face at that time. (*Id.*).

Ms. Blackwell and her parents continued to tell the MCDHS that Sydney and Randy were not providing good care for Angel, reporting that Angel had gotten a sunburn while under their care; that Angel would always come home hungry; that she was lethargic, and that Angel came home dirty, although she had been bathed before going with Sydney and Randy. (*Id.* 43:18-44:4; 46:5-14; Defs.' Ex. A-6-8 at MC-2369-71). The Blackwells complained that Sydney was not using a prescription dermatological medication that Angel needed for skin rash. (Defs.' Ex. A-6-8 at MC MC-2369-71).

Those complaints were documented in the MCDHS records. (*Id.*). A note in the MCDHS records states, "Problems with foster home trying to sabotage the kin placement." (*Id.* at MC-2369).

Angel moves to the Bond/White household on a full time basis (July 11, 2014)

Angel moved to the Bond/White household on a full-time basis on July 11, 2014.

On July 15, 2014, Sydney left a voicemail for defendant Stewart, saying that Angel had bruised her cheek by running into the corner of the island while playing tag. (Defs.' Ex. A-6-8 at MC-878). Sydney's report of that incident was strange because Angel was only 9 months old and not yet able to walk or even crawl.[11] Stewart did not follow up on that report immediately.

On July 23, 2014, the MCDHS obtained the signed written waiver, which waived the age requirement for Sydney to be certified as a foster parent. (Pl.'s Ex. 23, Waiver).

Ms. Stewart met with Sydney on July 24, 2014. During that meeting Sydney reported that Angel could get overwhelmed by the other kids. (Defs.' Ex. A-6-8 at MC-879). Concerns about

---

[11]As discussed above, Ms. Doll's Attachment Assessment (Def.'s Ex. A-6-7) had noted that Angel was delayed in her development of gross motor skills. She still was not crawling in early August, 2014. (*See* Def.'s Ex. A-6-8 at MC-885).

Angel's delayed motor skills were noted. Ms. Stewart offered to set up a Child Find assessment to determine whether Angel had any developmental or other disabilities. (*Id.*).[12]

Ms. Stewart visited the Bond/White house on August 1, 2014, to have some paperwork signed. (Defs.' Ex. A-6-8 at MC-85). Ms. Stewart's notes of that visit state that Angel was sitting in her high chair, eating, and appeared happy. (*Id.*). Sydney and Randy told Ms. Stewart that Angel was still not crawling and would become upset by the other children. Ms. Stewart suggested that Ms. Doll could provide assistance. (*Id.*).

Ms. Doll saw Sydney, Randy, Kaleb, Harper and Angel on August 7, 2014, in the lobby of the MCDHS offices. (Def.'s Ex. A-6-9 at MC- 2061-62). Sydney told Ms. Doll that Angel became upset around the other two children. Ms. Doll told Sydney that Angel had come from a very quiet environment and it could take time for Angel to adjust to a more active environment. Ms. Doll suggested that Sydney should keep a notebook, documenting Angel's behavior and the events that triggered Angel's crying. (*Id.*).

Ms. Stewart and Ms. Mercer conducted a home visit at the Bond/White household on August 20, 2014. (Defs.' Ex. A-6-8 at MC- 879 and MC-887-888). In notes of that visit, Ms. Stewart recorded that it "(s)eemed that Angel was doing better at first when they had her compared to now." (Defs.' Ex. A-6-8 at MC- 879). During that visit, Sydney reported that Angel"(w)ants attention all the time and is becoming used to their older child, but is scared of the younger one." (*Id.*). Sydney told Ms. Stewart and Ms. Mercer that Angel would whine and become hysterical; would throw frequent fits; and had cried for about an hour straight during the

_____

[12]A Child Find assessment was scheduled for September 30, 2014, *see* Defs.' Ex. A-6-8 at MC-890, but Angel died on September 17, 2014.

previous week. Sydney also said that Angel would sit down and zone out and rock back and forth. (*Id.*). Sydney described Angel as "(s)ensitive to things that wouldn't normally upset people," and expressed concern that Angel might have autism. (*Id.*).

During the meeting on August 20, 2014, Sydney told Ms. Stewart and Ms. Mercer that she (Sydney) was overwhelmed and asked for help. (Pl.'s Ex. 13, S. White Dep. at 20:6-23; 40:11-12). She told them, "I don't know what to do for her. . . . I don't want to give up on her, but I don't know what to do and this is hard." (*Id.* at 97:25-98:25).

Ms. Stewart suggested that Sydney might connect with Ms. Doll. (Defs.' Ex.A-5, Stewart Dep. at 122:24-123:11). Ms. Stewart and Ms. Mercer offered a kinship support group (which Sydney declined) but did not offer counseling. (Defs.' Ex. A-10, Mercer Dep. at 147:25-148:6).

On August 30, 2014, Ms. Mercer had a chance meeting at Walmart with Sydney, Randy, Angel, Kaleb, and Harper. (Defs.' Ex. A-6-8 at MC-19). Ms. Mercer made notes of that meeting in the MCDHS records, reporting that Angel looked happy and that Sydney and Randy had said that "everything was going good." (*Id.*)

The next home visit was scheduled for September 16, 2014. (*Id.*). Sydney called defendant Stewart on September 15, 2014, and told her that the home visit needed to be canceled because everyone in the family was sick. (Defs.' Ex. A-6-8 at MC-19 & MC-891).

Angel dies of child abuse

On September 15, 2014, Randy and Sydney took Angel to St. Mary's hospital in Grand Junction. When they arrived there, Angel presented as unresponsive with right sided jerking and flaccid left side. (Pl.'s Ex. 25, medical records of David Pettit, M.D., at MC-1283). The results of a CT scan of Angel's head showed evidence of "acute subdural blood on the right with massive

ischemic changes on the right . . . and patchy changes on the left . . . ." (*Id*. at MC-1285).

According to the radiologist's report, those "findings were highly suspicious for nonaccidental

trauma (battered child syndrome)." (*Id*. at MC- 1293).[13]

Angel was transferred to Children's Hospital in Aurora, Colorado, where she died on

September 17, 2014. (Pl.'s Ex. 26, Case Contact/Visitation Log).

Randy and Sydney initially denied that Angel had suffered any traumatic injury. Sydney

eventually admitted that she had taken Angel by the neck and shaken her violently because she

was screaming. Sydney also admitted to having kicked and bitten Angel. (*Id.* at 936).

Sydney White was arrested and charged with first-degree murder and child abuse. She

pleaded guilty to child abuse resulting in death and tampering with physical evidence and was

sentenced to 30 years in the Colorado Department of Corrections.

Plaintiff filed this civil action against defendants Anderson, Bedell and Stewart on

September 9, 2016.

## DISCUSSION

*Legal Standard for Summary Judgment*

Summary judgment is appropriate "when there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant

"bears the initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of [the record] which it believes demonstrate the absence of a genuine

---

[13]"Battered child syndrome" is "the clinical presentation of child abuse: various injuries to the skeleton, soft tissues, or organs of a child sustained as a result of repeated mistreatment or beating, usually by the person responsible for the child's care." Stedman's Medical Dictionary 877150.

issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this burden is met, then the non-moving party must set forth specific facts showing that there is a genuine dispute for trial. *Id* at 324. A fact is material if it might affect the outcome of the dispute under the applicable law. *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995). The Court must "view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party." *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).

*Qualified Immunity*

Qualified immunity shields public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Because the defendants have presented their qualified immunity defense at the summary judgment stage, the burden is on Plaintiff to demonstrate that each defendant violated Angel Place's constitutional or statutory rights and that the right was clearly established at the time of the alleged unlawful activity. *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1238 (10th Cir. 2018).

If Plaintiff does so, then Defendants must satisfy the traditional summary judgment standard of showing that there are no genuine issues of material fact and they are entitled to judgment as a matter of law. *Id.*; Fed.R.Civ.P. 56(a).

*Plaintiff's First and Second Claims – violation of Angel's right of Substantive Due Process*

Plaintiff's first and second claims allege that Defendants violated Angel's right of Substantive Due Process guaranteed by the Fourteenth Amendment to the United States Constitution.

The Due Process Clause of the Fourteenth Amendment provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. Generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). "(S)tate actors are generally only liable under the Due Process Clause for their own acts and not for private violence." *Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995).

There are two recognized exceptions to that principle – the "special relationship doctrine" and the "state-created danger" theory.

Special relationship doctrine

The special relationship doctrine applies "when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual." *Uhlrig*, 64 F.3d at 572; *Schwartz v. Booker*, 702 F.3d 573, 579-80 (10th Cir. 2012). A Due Process claim premised on the special relationship doctrine has the following four elements:

> First, the plaintiff must demonstrate the existence of a special relationship, meaning that the plaintiff completely depended on the state to satisfy basic human needs. *DeAnzona v. City & Cty. of Denver*, 222 F.3d 1229, 1234 (10th Cir. 2000). Second, the plaintiff must show that the defendant knew that the plaintiff was in danger or failed to exercise professional judgment regarding that danger. *Schwartz*, 702 F.3d at 583. Third, the plaintiff must show that the defendant's conduct caused the plaintiff's injuries. *Id.* And finally, fourth, the defendant's actions must shock the conscience. *Id.*

*Dahn v. Amedei*, 867 F.3d 1178, 1185-86 (10th Cir. 2017).

"(F)oster care is recognized as one of the custodial relationships that creates a special relationship." *Schwartz*, 702 F.3d at 580; *Johnson v. Holmes*, 455 F.3d 1133, 1141-42 (10th Cir. 2006); *Yvonne L. ex rel. Lewis v. New Mexico Dep't of Human Servs.*, 959 F.2d 883 (10th Cir. 1992); *Hubbard v. Okla. ex rel. Okla. Dep't of Human Servs.*, No. 17-6162, 2018 WL 6822285 at *11 (10th Cir. Dec. 28, 2018) (unpublished).

State-created danger theory

The state-created danger theory applies when the State creates or increases a harm of private violence to an individual. *Schwartz*, 702 F.3d at 579-80 (citing *Armijo ex rel. Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1262- 63 (10th Cir. 1998)). To establish liability under the state-created danger theory, the plaintiff must show:

> 1) Plaintiff was a member of a limited and specifically definable group;
> 2) Defendant's conduct put Plaintiff at substantial risk of serious, immediate, and proximate harm; 3) the risk was obvious or known; 4) Defendant acted recklessly in conscious disregard of that risk; . . . 5) such conduct, when viewed in total, is conscience shocking(;) (and 6) ) defendant actors created the danger or increased the plaintiff's vulnerability to the danger in some way.

*DeAnzona v. City & Cty. of Denver*, 222 F.3d 1229, 1235 (10th Cir. 2000) (citing *Armijo*, 159 F.3d at 1262-63). Affirmative conduct by the state actor is a precondition to application of the state-created danger theory. *Schwartz*, 702 F.3d at 579, n.4 (citing *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 920 (10th Cir. 2012)).

The conduct of social workers involved in the placement of foster children and supervision of a foster home may give rise to liability under the state-created danger theory. An illustrative Tenth Circuit case is *T.D. v. Patton*, 868 F.3d 1209 (10th Cir. 2017), a § 1983 action

-25-

brought by the representative of a minor child who had been abused by his father. The plaintiff claimed that a social worker employed by the Denver Department of Human Services had violated the minor child's Substantive Due Process rights by recommending that the child be placed in and kept in the father's temporary custody, and by failing to investigate whether the father was abusing child – despite being on notice of evidence supporting such abuse. The defendant social worker moved for summary judgment, asserting the defense of qualified immunity. The United States District Court for the District of Colorado (Moore, J.) denied the motion as to the plaintiff's claim under the state-created danger theory, and the United States Court of Appeals for the Tenth Circuit affirmed, holding that during the relevant time period the law was clearly established that such conduct by a social worker violated the child's substantive due process right to be free from a state official's creation of danger from a private actor. 868 F.3d at 1225.

Similarly, in *Currier v. Doran*, 242 F.3d 905 (10th Cir. 2001) the United States Court of Appeals for the Tenth Circuit held that allegations against a social worker (Tom Doran) who had responsibility for a court order granting legal custody of two children to the father, were sufficient to state a claim under the state-created danger theory. The plaintiff alleged that before the father obtained custody, Doran had failed to investigate allegations of abuse by the father and had failed to investigate bruises on the children after being told the bruises resulted from falls. 242 F.3d at 919-20. The Tenth Circuit stated that "(b)y failing to investigate the allegations of child abuse and by recommending that (the father) assume legal custody, Doran's conduct put (the children) at obvious risk of serious, immediate, and proximate harm, a harm that Doran recklessly and consciously disregarded." *Id.* at 920. The Court determined that such allegations,

if true, were conscience-shocking. The Tenth Circuit also ruled that the doctrine of qualified immunity did not shield Doran from liability because, by 1993 and 1994, a reasonable state official would have known that "reckless, conscience shocking conduct that altered the status quo and placed a child at substantial risk of serious, immediate, and proximate harm was unconstitutional." *Id.* at 924.[14]

<u>The "shocks the conscience" standard</u>

To prevail under either the the special relationship doctrine or the state-created danger theory, the plaintiff must establish that the state actor's alleged wrongful conduct is conscience shocking. "(I)t's not enough for a plaintiff to allege that a state official failed to exercise her professional judgment." *Bishop v. Szuba*, 739 Fed. App'x 941, 944 (10th Cir. 2018) (unpublished) (citing *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1239 (10th Cir. 2018). "Rather, a plaintiff must show that a defendant 'abdicated her professional duty sufficient to shock the conscience.' " *Id*. (quoting *Schwartz*, 702 F.3d at 585-86). That is, the "shocks the conscience" standard is a separate element of the claim.

To meet that standard, the plaintiff must show more than merely negligent conduct on the part of the defendant. "[T]he Due Process Clause is not violated by merely negligent conduct, . . .

---

[14]In C*urrier v. Doran,* the Tenth Circuit evaluated defendants' motions under the standard applicable to a motion to dismiss, although the motions were filed as motions for summary judgment. 242 F.3d at 911. In addition to the conclusions described above, the Court also held that a constitutional violation was shown by the conduct of another defendant (Shirley Medina) who allegedly instructed the mother to stop making reports of abuse, but qualified immunity shielded Medina from liability because the law was not clearly established as to that conduct. 242 F.3d at 921-22 & 924-25. The Court also concluded that the plaintiff's allegations were sufficient to state a Substantive Due Process claim against a supervisor (Melba Gonzalez) who allegedly was aware of the unconstitutional conduct of defendants Doran and Medina, and failed to correct it. *Id.* at 921-22 & 924.

a social worker who simply makes a mistake of judgment under what are admittedly complex and difficult conditions will not find herself liable in damages under § 1983." *DeShaney*, 489 U.S. at 211 (Brennan, J., dissenting); *see also Sutton v. Utah State School for the Deaf and Blind*, 173 F.3d 126, 1238 (10th Cir. 1999) ("Liability under the Due Process Clause may not be based on negligent action . . . . ") (citations omitted).

The determination of whether a defendant's conduct shocks the conscience must be based on that person's own conduct. The conduct of numerous actors cannot be aggregated. *See Hubbard v. Okla. ex rel. Okla. Dep't of Human Servs.*, 759 Fed. App'x 683, 706 (10th Cir. 2018) (unpublished) ("The individual defendants' alleged actions, in the aggregate, may come closer to the shocks the conscience standard than any individual defendant's actions, but the (plaintiffs') § 1983 claims must stand or fall based on the conduct of each defendant individually.").

"Conduct is shocking to the conscience when the 'degree of outrageousness and ( ) magnitude of potential or actual harm ( ) is truly conscience shocking.' " *Schwartz*, 702 F.3d at 586 (alterations in original) (quoting *Armijo*, 159 F.3d at 1262).

Whether a state actor's conduct meets that standard is for the Court to determine. *See, e.g., Sutton*, 173 F.3d at 1238 ("(P)laintiff-appellant's claim must be predicated on reckless or intentionally injury-causing state action which shocks the conscience of federal judges."); *see also Collins v. City of Harker Heights Tex.*, 503 U.S. 115, 126 (1992) (explaining that the standard for judging a substantive due process claim is whether the challenged government action would shock the conscience of federal judges). Thus, even when the plaintiff comes forth with evidence to support the conclusion that a defendant failed to exercise professional judgment, the court must determine whether that conduct was so egregious as to shock the conscience. *See*

*Uhlrig*, 64 F.3d at 572-73 ("(O)n these facts we have no difficulty concluding that Defendants did not engage in any conduct that was so egregious, outrageous and fraught with unreasonable risk so as to shock the conscience.").

The Tenth Circuit has recognized that three basic principles are relevant to the evaluation of whether conduct of a state actor rises to the level of a substantive due process violation: "(1) the general need for restraint; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety." C*urrier*, 242 F.3d at 920; *Uhlrig*, 64 F.3d at 573.

*Sufficiency of the evidence supporting Plaintiff's Substantive Due Process Claims*

Defendants' qualified immunity defense to Plaintiff's Substantive Due Process claims is not premised on a lack of clearly established law. Rather, the defendants argue that the record evidence is not sufficient to show they committed a constitutional tort. In short, the qualified immunity analysis requires evaluation of the sufficiency of the evidence supporting the Substantive Due Process claims.

Defendants argue that Plaintiff's claim premised on the special relationship doctrine fails for lack of evidence showing that any of them knew that Sydney White would kill or even injure Angel. Defendants further assert that the evidence does not support the conclusion that they failed to exercise professional judgment in the execution of their job duties in placing Angel in kin foster care and supervising that placement. Defendants argue that no conduct (or omission) of any Defendant caused or contributed to Angel's death or rises to the level of malfeasance that shocks the conscience. (Def.'s mot. at pp. 15-16).

Defendants contend that Plaintiff's claim premised on the state-created danger theory claim likewise fails due to lack of evidence that any Defendant knew Angel was in danger of serious, immediate and proximate harm; lack of evidence of an obvious or known risk; and lack of evidence that any Defendant disregarded such risk. Defendants say there is no evidence of conscience-shocking conduct on the part of any of them. (Def.'s mot. at p. 16).

Plaintiff's evidence of allegedly wrongful conduct focuses on two categories of conduct: (1) the recommendation that Angel's foster care placement should be moved from Ms. Blackwell's home to the Bond/White household; and (2) defendant Stewart's monitoring of Angel during the transition period and after Angel was placed in the Bond/White household.

<u>Defendants' liability for the placement recommendation</u>

As discussed above, all three defendants participated in the placement recommendation. Defendant Anderson participated by conducting the Home Study and concluding that the Bond/White household was an appropriate foster home for Angel. Defendant Bedell concurred in that conclusion. Defendant Stewart provided testimony on behalf of the MCDHS at the June 17 hearing, opining that it was in Angel's best interest to be placed in the Bond/White Household.

Plaintiff argues that Defendants abdicated their professional responsibilities by ignoring "red flags" that should have alerted them to the potential for child abuse by Sydney and/or Randy. According to Plaintiff, the "red flags" were:

• Sydney's and Randy's troubled childhoods;

• the reports showing that as youths, they both were victims of abuse;

-30-

- the 2010 Trails System Report which included statements by Sydney's mother describing physical and verbal altercations with Sydney and stating that Sydney had once scratched her mother's face;

- Sydney was only 20 and already had two small children;

- Sydney suffered from untreated anxiety and depression and social isolation;

(Pl.'s resp. at 31).

Plaintiff relies on the opinions of Dr. Frank Kunstal, a licensed psychologist retained by Plaintiff as an expert witness. He states in his report that the MCDHS "overlooked, underestimated, or ignored obvious indicators that this potential placement was not correct for Angel, and that the MCDHS "showed a prioritization of transition to kinship over the child's need for consistency, predictability, and to maintain continuity of her care in her foster home." (Pl.'s Ex. 18-A, Kunstal report at pp. 3 & 10). Dr. Kunstal states that the MCDHS "willfully prioritized the issue of placement of the child, over responding to the child's best interests." (Pl.'s Ex. 18-A, Kunstal report at p.1).[15]

Defendants dispute that they abdicated professional responsibilities, pointing out that the law requires kinship preference. Defendants emphasize that the Magistrate who presided over the Juvenile Court Action determined it was in Angel's best interest to be placed with the Bond/White kinship family.

---

[15]Plaintiff also says that the placement recommendation conflicted with the MCDHS's own Kinship Care and Placement Procedure, which states that "the placing case manager will not initiate a visitation with kin" if certain concerns are present, including "a history of domestic violence involving the kin." (Pl.'s resp. at p. 33 & 41, citing Pl.'s Ex. 10). Defendants reply that Plaintiff misinterprets the policy, explaining that the policy language quoted by Plaintiff relates to emergency 60-day kinship placements, and not to placements that have been vetted by a Home Study. (Defs.' reply at pp. 19-20, n. 11).

<u>Applicability of the *Rooker-Feldman* doctrine</u>

Defendants argue that the *Rooker-Feldman* doctrine prohibits this Court from evaluating whether the placement decision was correct.

The *Rooker-Feldman* doctrine generally "precludes lower federal courts from effectively exercising appellate jurisdiction over claims actually decided by a state court and claims inextricably intertwined with a prior state-court judgment." *P.J. ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1193 (10th Cir. 2010) (citation and quotations omitted). The *Rooker-Feldman* doctrine does not apply, however, if critical facts were intentionally withheld from the state court, and the state court had no other way of knowing those facts. *See Wagner*, 603 F.3d at1193; *Davis v. Garcia*, 573 F. App'x 689 (10th Cir. 2014) (unpublished).

According to Defendants, application of the *Rooker-Feldman* doctrine means that the State Court's placement decision is dispositive of Plaintiff's claims regarding (a) the placement recommendation; (b) the Defendants' alleged failure to inform the State Court of the "red flags;" and (c) the actual post-hearing placement of the child with the kin family. Defendants show that the so-called "red flags" were described in the Home Study, which was admitted into evidence at the June 17, 2014 hearing. Defendants point out that during the hearing Magistrate McNulty stated on the record that he had reviewed the Home Study before the hearing, and that he reviewed it again before announcing his ruling. Defendants say that in light of those facts, the State Court's placement decision forecloses any issue of law or fact about whether the defendants' recommendation, which was based on the same evidence and reasoning applied by the State Court, could be viewed as a conscience-shocking abdication of Defendants' professional judgment.

In response, Plaintiff argues that the *Rooker-Feldman* doctrine does not apply because defendant Stewart gave less than complete information when she testified at the hearing. Plaintiff says defendant Stewart misled the Magistrate by failing to disclose that (a) Sydney White was only 20 years old; (b) Colorado state regulations required a waiver; (c) although the decision to grant the waiver had already been made, the corresponding paperwork and not yet been signed at the time of the hearing.

In reply, Defendants dispute that Stewart misled the State Court, pointing out that Sydney's birth date was stated in the Home Study, and no one made an issue of her age at the hearing. Defendants emphasize that defendant Stewart was merely a witness who answered the questions asked of her by the County Attorney and Ms. Blackwell. Defendants also say that it is presumed the Magistrate knew the law. Defendants argue that because the state court evidentiary record included the "red-flag" information, the circumstances required to avoid application of the the *Rooker-Feldman* doctrine are not present here.

Defendants are correct that the seventeen-page Home Study report was introduced into evidence at the hearing, and the Home Study contains the significant "red flag" information. (*See* Ex. A-6-5 at MC 2017-2035). Sydney White's age was clearly documented in it. Sydney testified at the hearing, and so Magistrate McNulty was able to observe her at that time. When the County Attorney asked Ms. Stewart if there was any other information that the Court needed to know, Stewart could have testified about the matter of the waiver, but even so, all that remained to be done was to obtain a signature on the written waiver form.

The *Rooker-Feldman* doctrine applies. Moreover, when Defendants made the placement recommendation, the proposed placement did not pose an obvious danger to Angel's safety.

Plaintiff does not contend that the Home Study was incomplete or that defendant Anderson failed to investigate fully Randy's and Sydney's backgrounds. The recommendation that Angel be placed in the Bond/White household may have placed too much weight on the law's preference for kinship placement, but I have reviewed the Home Study (as Judge McNulty did) and cannot say that the recommendation was conscience-shocking.

Plaintiff's Substantive Due Process claims against defendants Anderson and Bedell are based only on the placement recommendation. Because the evidence is not sufficient to create a triable issue about Plaintiff's Substantive Due Process claims based on the placement recommendation, Plaintiff's first and second claims against defendants Anderson and Bedell shall be dismissed. Plaintiff' Substantive Due Process claims against defendant Stewart also fail to the extent those claims are premised on Stewart's participation in the recommendation and her testimony at the June 17, 2014 hearing.

Defendant Stewart's liability for alleged deficient monitoring of Angel's placement in the Bond/White household

Plaintiff contends that during the transition period and after Angel was moved to the Bond/White household, defendant Stewart ignored common risk factors and signs of child abuse. Plaintiff asserts that defendant Stewart abdicated her professional responsibilities by failing to get help or remove Angel when it was obvious the placement was failing. That is, Plaintiff alleges that defendant Stewart should have recognized that Angel's health and safety were being jeopardized and should have intervened to rescue her from obvious danger.

As discussed above, the state-created danger theory requires affirmative conduct on the part of the defendant that increases the risk of danger. For the period after June 17, 2014 when

the State Court issued its ruling, there is no evidence of such affirmative conduct by defendant Stewart (or the other defendants). Accordingly, Plaintiff's constitutional claim against defendant Stewart for alleged deficiencies in the monitoring of the court-ordered placement can be premised only on the special relationship doctrine.

To support that claim against defendant Stewart, Plaintiff points to the evidence showing:

- Ms. Blackwell reported that Angel came back from Bond/White house with sunburn;

- Ms. Blackwell reported that Angel would frequently return from the Bond/White household dirty and hungry;

- Ms. Blackwell reported that Angel appeared lethargic after she returned from visits with White;

- Ms. Blackwell reported that Sydney refused to use medication supplied by Blackwell;

- the Blackwells reported that Angel had blood running from her ear after returning from the kinship home;

- Ms. Blackwell reported the July 3, 2014 incident when Angel had a red mark under her right eye;

- Sydney left a voicemail for Stewart on July 15, 2014, stating that Angel had bruised herself playing tag. Plaintiff points out that Angel could not even walk then, and clearly could not have been running and playing tag;

- Angel's delayed development (i.e., not crawling and pulling herself as would be expected for a child of her age);

- the descriptions of Angel's condition during the home visit on August 20, 2014. Plaintiff's expert Dr. Kunstal opines that "(f)indings during the Case Manager home visit of August 20, 2014, should have alerted the Department to the jeopardy of the child in care." He explains that the description of Angel's behavior on August 20, 2014, represented a "rapid downward trajectory of the child." (Pl.'s Ex. 18-A, Kunstal Report at p. 5).

In response, Defendants argue that the record does not support the conclusion that defendant Stewart abdicated her professional duties, pointing to evidence showing:

- Ms. Blackwell's complaints were documented and defendant Stewart spoke with Sydney about those complaints;

- The report of suspected child abuse on July 3, 2014 (the red mark under Angel's eye), was documented, investigated, and found to be unsupported, not only by the MCDHS, but also by law enforcement;

- When concerns were raised about Angel's developmental delays, defendant Stewart offered support by setting up the Child Find Assessment.

- Defendant Stewart also knew that Sydney had scheduled a doctor appointment for Angel, and Sydney had said she would discuss those concerns with the doctor.

Defendants argue that the evidence of defendant Stewart's conduct at most could be characterized as negligence, and is not sufficient to rise to the "conscience shocking" standard required to prove a Substantive Due Process violation.

Whether defendant Stewart was merely negligent or whether her conduct shocks the conscience is a difficult call because the death of a helpless infant evokes such a powerful emotional response. In *White ex rel. White v. Chambliss*, 112 F.3d 731, 739 (4th Cir. 1997), a

case involving similar claims against state actors, the United States Court of Appeals for the

Fourth Circuit stated:

> We are reminded again that the defense of qualified immunity is often asserted in the most difficult of cases. Yet it is precisely for the hard case that the immunity exists. The availability of immunity cannot be judged solely by tragedies that later occur or by mistakes that later come to light. Knowing what we know now, no child would have been placed in the care of the (abusive foster parents). But now is not then, and few mortals stand unscathed by hindsight.

112 F.3d at 739.

The shocks the conscience standard is susceptible to *post hac* reasoning that must be

avoided. Plaintiff's Substantive Due Process claim against defendant Stewart presents just such a

temptation. The test, however, must be based on what was known or should have been known at

the time the decision was made. I find no basis using that standard that defendant Stewart's

conduct was anything but reasonable under all the attendant and known circumstances. Thus, the

Substantive Due Process claim against her cannot survive summary judgment.

### *Third claim for violation of the Adoption Assistance and Child Welfare Act*

Plaintiff's third claim is for alleged violations of certain provisions of the Adoption

Assistance and Child Welfare Act (AACWA), 42 U.S.C. § 670 et seq. Plaintiff invokes

42 U.S.C. § 1983 to redress these alleged statutory violations, seeking damages against the

defendants in their official and individual capacities. (*See* Pl.'s resp. at p. 59).

Defendants move for dismissal of the third claim, arguing that the subject provisions of

the AACWA do not provide rights enforceable under § 1983.

<u>Standard for determining whether a statute provides an enforceable right</u>

To determine whether a federal statute gives rise to a federal right enforceable under

§ 1983, the Court must consider the following three factors:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms.

*Blessing v. Freestone*, 520 U.S. 329, 340-41(1997)(citations omitted); *see also Gonzaga Univ. v.*

*Doe*, 536 U.S. 273, 279-86 (2002) (discussing standard for determining whether an alleged

statutory violation may be enforced through § 1983).

In *Gonzaga University v. Doe*, the United States Supreme Court clarified that "it is rights,

not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of

(§ 1983)," and rejected the notion that "anything short of an unambiguously conferred right"

would support a cause of action under that statute. *Gonzaga*, 536 U.S. at 283. The Supreme

Court explained that "where the text and structure of a statute provide no indication that

Congress intends to create new individual rights, there is no basis for a private suit, whether

under § 1983 or under an implied right of action." *Id.* at 286.[16]

---

[16]In *Gonzaga*, a student brought suit under 42 U.S.C. § 1983, alleging violations of provisions of the Family Educational Rights and Privacy Act of 1974 (FERPA), 88 Stat. 571, 20 U.S.C. § 1232g, which prohibit federal funding of educational institutions that have a policy or practice of releasing education records to unauthorized persons. The Court held that FERPA's nondisclosure provisions created no personal rights enforceable under § 1983.

<u>The AACWA</u>

"The AACWA establishes a program under which states can receive federal payments for state foster care programs." *Yvonne L.ex rel. Lewis v. New Mexico Dep't of Human Servs.*, 959 F.2d 883, 886 (10th Cir. 1992) (citing 42 U.S.C. §§ 620-28, 670-76); *see also 31 Foster Children v. Bush*, 329 F.3d 1255, 1270 (11th Cir. 2003) (describing the AACWA funding program). It was enacted under Congress' spending authority.

To participate in the program, a State must submit for approval by the Secretary of Health and Human Services a plan for foster care and adoption assistance that meets requirements described in 42 U.S.C. § 671(a). "Section 671's requirements are numerous and far-ranging; they run from dictating how information about individuals involved in the foster care system may be disclosed, . . . to providing guidelines on how and when a state should give priority to reuniting families . . . ." *New York State Citizens' Coalition for Children v. Poole*, 922 F.3d 69, 77 (2d Cir. 2019).

In this action, Plaintiff claims violations of 42 U.S.C. § 671(a)(10) and § 671(a)(16).[17]

<u>Section 671(a)(10)</u>

Section 671(a)(10) provides that "for a State to be eligible for payments under this part it shall have a plan approved by the Secretary which":

(10) provides –

(A) for the establishment or designation of a State authority or authorities that shall be responsible for establishing and maintaining standards for

---

[17]Plaintiff previously alleged violations of § 671(a)(24), in addition to violations of § 671(a)(10) and § 671(a)(16).  *See* ECF No. 17 at pp. 4-5. Plaintiff's response to Defendants' motion for summary judgment identifies only § 671(a)(10) and § 671(a)(16) as the bases for the AACWA claim. Plaintiff apparently has abandoned any claim premised on § 671(a)(24).

foster family homes and child care institutions which are reasonably in accord with recommended standards of national organizations concerned with standards for the institutions or homes, including standards related to admission policies, safety, sanitation, and protection of civil rights, and which shall permit use of the reasonable and prudent parenting standard;

(B) that the standards established pursuant to subparagraph (A) shall be applied by the State to any foster family home or child care institution receiving funds under this part or part B and shall require, as a condition of each contract entered into by a child care institution to provide foster care, the presence on-site of at least 1 official who, with respect to any child placed at the child care institution, is designated to be the caregiver who is authorized to apply the reasonable and prudent parent standard to decisions involving the participation of the child in age or developmentally-appropriate activities, and who is provided with training in how to use and apply the reasonable and prudent parent standard in the same manner as prospective foster parents are provided the training pursuant to paragraph (24);

(C) that the standards established pursuant to subparagraph (A) shall include policies related to the liability of foster parents and private entities under contract by the State involving the application of the reasonable and prudent parent standard, to ensure appropriate liability for caregivers when a child participates in an approved activity and the caregiver approving the activity acts in accordance with the reasonable and prudent parent standard; and

(D) that a waiver of any standards established pursuant to subparagraph (A) may be made only on a case-by-case basis for nonsafety standards (as determined by the State) in relative foster family homes for specific children in care; . . .

42. U.S.C. § 671(a)(10).

Plaintiff contends that § 671(a)(10) entitles a foster child to placement in a foster home that conforms with national professional standards, and that one such standard is that a foster parent, generally, must be at least 21 years old. Plaintiff alleges that Defendants violated § 671(a)(10) by recommending that Angel be placed in the Bond/White household when Sydney

White was not yet 21 and before the process of waiving that age requirement had been completed.

In *Spielman v. Hildebrand*, 873 F.2d 1377 (10th Cir. 1989), the United States Court of Appeals for the Tenth Circuit stated, "There is considerable doubt whether the AACWA confers any substantive rights that can be the subject of an action for damages under section 1983." 873 F.2d at 1386. The Tenth Circuit held that the specific AACWA provision at issue in that action – § 671(a)(12) – did not confer any federal right upon the plaintiffs, but the Court did not decide whether an action for damages is generally unavailable under the AACWA.

Three years later, in *Yvonne L.ex rel. Lewis v. New Mexico Dep't of Human Servs.*, 959 F.2d 883 (10th Cir. 1992), the Tenth Circuit concluded that "individual causes of action (under the AACWA) may be appropriate, depending upon the particular section or violation involved." 959 F.2d at 889. With respect to the plaintiff's claim under § 671(a)(10), the Tenth Circuit stated:

> The language of § 671(a)(10) by itself does not support such a cause of action. It only references "standards of national organizations concerned with standards for such institutions or (foster) homes." That is the type of vague and amorphous language identified in *Wilder*, 110 S.Ct. at 2517, and *Wright*, 479 U.S. at 431-32, 107 S.Ct. at 774-75, that cannot be judicially enforced.[18]

*Yvonne L.*, 959 F.2d at 990. The Tenth Circuit also stated that the record in that action did not include a copy of the state plan, and the plaintiffs had not identified how the state plan failed to meet national standards, or how the defendants had violated state plan standards. *Id.* at 890.

_____

[18]Referring to *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990) and *Wright v. City of Roanoke Redev. & Hous. Auth.*, 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987)).

Plaintiff argues that the *Yvonne L.* court's discussion of § 671(a)(10) should be interpreted to mean that § 671(a)(10) confers an enforceable right in this case because here Plaintiff has identified specifically how Defendants failed to meet a nationally-recognized standard.

As to the first part of the *Blessing* test, Congress clearly intended the AACWA to benefit children in state foster care. The more difficult question is whether the right assertedly protected by § 671(a)(10) is too vague and amorphous for judicial enforcement.

Significantly, in *Yvonne L.,* the Tenth Circuit stated that section is too vague for enforcement. Under the law of this Circuit, § 671(a)(10) does not confer rights enforceable under § 1983.

Section 671(a)(16)

Plaintiff also alleges that Defendants violated § 671(a)(16). That section states that for a State to be eligible for payments under the Act it shall have a plan approved by the Secretary which:

> provides for the development of a case plan (as defined in section 675(1) of this title and in accordance with the requirements of section 675a of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in sections 675(5) and 675a of this title with respect to each such child; . . . .

42 U.S.C. § 671(a)(16).

Section 675 provides definitions of terms used in the Act, and defines a "case plan" as a written document that includes, among other requirements, "(a) plan for assuring that the child receives safe and proper care . . . ." *Id.* § 675(1). Subsection 675(5) defines "case review system" as a procedure for assuring that "each child has a case plan designed to achieve placement in a

-42-

safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child . . . ."

Plaintiff contends that § 671(a)(16) – read in conjunction with those definitions – entitles a foster child to a case plan that assures that he or she will be safe and receive proper care. Plaintiff claims that Defendants violated the statutory case plan requirement by recommending that Angel be placed in an unsafe household. Plaintiff further alleges that defendant Stewart violated § 671(a)(16) by failing to take action after problems with Angel's placement in the Bond/White household were or should have been apparent.

The Tenth Circuit has not addressed whether § 671(a)(16) confers rights that can be the subject of an action for damages under § 1983. Notably, in *Whitley v. N.M. Children, Youth, & Families Dep't*, 184 F. Supp. 2d 1146, 1164 (D.N.M. 2001), the United States District Court for the District of New Mexico granted summary judgment in favor of the defendants on the plaintiff's claim under § 671(a)(16), finding that the language of that section is "similar to the language of § 671(a)(10), which the Tenth Circuit found too vague and amorphous to support a cause of action under § 1983." 184 F. Supp. 2d at1164 (citing *Yvonne L.*, 959 F.2d at 888). Similarly, in *D.G. ex rel. Stricklin v. Henry*, 594 F. Supp. 2d 1273, 1280 (N.D. Okla. 2009), the District Court for the Northern District of Oklahoma held that "(n)one of the statutory provisions of AACWA cited by plaintiffs indicates Congress has spoken clearly to manifest an intent to confer rights on individual plaintiffs under § 1983."

Circuit Courts that have addressed § 671(a)(16) or the related "case plan" and "case review system" definitions have come to different conclusions about whether those provisions confer rights enforceable under § 1983.

The United States Court of Appeals for the Eleventh Circuit, in *31 Foster Children v. Bush*, 329 F.3d 1255, 1275-76 (11th Cir. 2003), held that the definitions set forth in §§ 675(5)(D) and (E) of the AACWA do not confer a private right of action enforceable under 42 U.S.C. § 1983.

The United States Court of Appeals for the Fourth Circuit, in *L.J. ex rel Darr v. Massinga*, 838 F.2d 118 (4th Cir. 1988), held that the case plan and case review provisions of the AACWA "spell out a standard of conduct, and as a corollary rights in plaintiffs," and that such rights "are privately enforceable under 42 U.S.C. § 1983." 838 F.3d at 123.

In *Lynch v. Dukakis*, 719 F.2d 504 (1st Cir. 1983), the United States Court of Appeals for the First Circuit allowed plaintiffs to proceed with a private cause of action for injunctive relief for violations of the § 671(a)(16) case plan provision and the § 675(5)(B) status review provision. Likewise, in *Henry A. v. Willden*, 678 F.3d 991 (9th Cir. 2012), the United States Court of Appeals for the Ninth Circuit found that "Section 671(a)(16) unambiguously requires the State to provide for the development of a case plan 'for each child,' "and held that "the case plan provisions of the (AACWA), codified at §§ 671(a)(16) and 675(1), are enforceable through § 1983." 678 F.3d at 1008. The Ninth Circuit stated that the majority of federal courts hold that the case plan provisions are enforceable through § 1983. 678 F.3d at 1006 (collecting cases).

Plaintiff urges this Court to follow the line of cases holding that § 671(a)(16) confers a right enforceable under § 1983.

<u>If Section 671(a)(16) creates an enforceable right, is the remedy limited to injunctive relief?</u>

Defendants reply that even those cases holding that § 671(a)(16) creates an enforceable right have gone only so far as to require the state to develop a case plan for each child. That is, Defendants argue that even if a private right of action exists under that section of the AACWA, the available remedy is limited to injunctive relief.

In a surreply, Plaintiff argues that damages are an available remedy, citing *New York State Citizens' Coalition for Children v. Poole*, 922 F.3d 69 (2d Cir. 2019). Plaintiff acknowledges, however, that *Poole* involved provisions of the AACWA that are not at issue here.

In *Poole*, a children's advocacy organization brought suit under § 1983, claiming that the New York State Office of Children and Family Services had violated the AACWA by failing to pay foster parents adequate rates to cover the costs of caring for foster children. The District Court dismissed the suit, concluding that the subject AACWA provisions (§§ 672(a)(1) and 675(4)(A)) did not confer a right enforceable under § 1983.

In a 2-1 decision, the United States Court of Appeals for the Second Circuit reversed the District Court's judgment. Applying the *Blessing* test, the majority (Calabresi, J. and Sessions, J.) analyzed the AACWA provisions that describe foster care maintenance payments and eligibility requirements and reviewed the AACWA's enforcement scheme. 922 F.3d at 76-85. The majority concluded that the AACWA creates a specific entitlement for foster parents to receive foster care maintenance payments, and that this entitlement is enforceable through a § 1983 action. *Id.* at 74 & 85.

In a lengthy dissent, one member of the panel (Livingston, J.) criticized the majority for selectively reading the statutory scheme and failing to recognize the import of *Gonzaga* and recent Supreme Court precedent addressing the question of whether a statute enacted under Congress's Spending Authority confers a right enforceable under § 1983. The dissent concluded that "Congress did not provide for private enforcement of §§ 672(a)(1) and 675(4)(A) pursuant to § 1983 – unambiguously or otherwise." *Id.* at 101.

The Second Circuit's *Poole* opinion provides no guidance because the analysis requires attention to the specific provision alleged to have been violated, and the AACWA provisions at issue in *Poole* are not the subject of Plaintiff's claim in this action. In addition, the *Poole* plaintiffs were seeking interpretation and enforcement of a statutory reimbursement scheme. They were not claiming that the subject AACWA provisions created an enforceable right to damages against state actors in their individual capacities.

Here Plaintiff does not complain that Defendants or the MCDHS or the State of Colorado violated § 671(a)(16) by failing to develop a written case plan for Angel or by failing to implement a case review system for her placement. Plaintiff's theory is that Defendants violated that section by implementing a case plan that did not ensure Angel's safety.

Such a claim is not supported by the case law.

In *Henry A.*, the plaintiffs' claim under § 671(a)(16) sought only an injunction requiring the development of case plans and a case review system. *See also Lynch v. Dukakis*, 719 F.2d 504, 506 (1st Cir. 1983) (same); *Sam M. v. Chafee*, 800 F. Supp. 2d 363, 366, 383-89 (D.R.I. 2011) (same); *Connor B. v. Patrick*, 771 F. Supp. 2d 142, 150, 162-72 (D. Mass. 2011) (same); *Brian A.*, 149 F. Supp. 2d at 944-46 (same); *Marisol A. v. Giuliani*, 929 F.Supp. 662 (S.D.N.Y.

1996) (plaintiffs' claim under § 671(a)(16) survived motion to dismiss but plaintiffs sought only injunctive and declaratory relief).

The only case supporting the view that § 671(a)(16) creates a privately enforceable claim for damages is *L.J. ex rel Darr v. Massinga*, 838 F.2d 118 (4th Cir. 1988). There, foster children brought claims under § 1983 against city and state officials responsible for administering Maryland's federally funded foster care program, claiming the defendants had violated plaintiff's constitutional rights and violated the AACWA by placing the plaintiffs in unsuitable foster homes and failing to protect them. The defendants asserted the defense of qualified immunity and moved for summary judgment in their favor. The District Court denied the motion, and the Fourth Circuit affirmed, explaining that the defendants' right to immunity must be determined by an objective test and there were factual issues regarding the defendants' conduct. The Fourth Circuit stated, "We should not be understood, however, to mean that defendants or any of them are necessarily liable for money damages." 838 F.3d at 1123.

The United States District Court for the Southern District of New York, in *Elisa W. ex rel. Baricelli v. City of New York*, No. 15 CV 5273-LTS-HBP, 2016 WL 4750178 (S.D.N.Y. Sept. 12, 2016), concluded that although § 671(a)(16) provided an enforceable right to have the state develop a case plan, the written case plan provisions did not establish an individually enforceable right to implementation of a written plan that ensures safe and appropriate outcomes. *Id.* at **5-6. The District Court dismissed that aspect of the plaintiffs' AACWA claim premised on that theory.

I agree with that reasoning.

In sum, I conclude that Plaintiff's claim for damages under § 671(a)(16) of the AACWA should be dismissed because that section's written case plan requirement does not confer rights that can be the subject of an action for damages under § 1983.

<u>Availability of monetary relief against state actors who are not official policy makers</u>

Defendants also argue that Plaintiff's damages claim under the AACWA fails because they are not official policy makers. Defendants cite *Young v. City of Idabel*, 721 F. App'x 789, 801-02 (10th Cir. 2018).

The plaintiff in *City of Idabel* was the city's former fire chief. After his employment was terminated, the plaintiff brought suit against the city and its mayor, alleging among other claims, claims of race discrimination and hostile work environment in violation of Title VII and the Equal Protection Clause. The Court held that the plaintiff's § 1983 equal protection claim against the mayor in his official capacity failed because the mayor did not have final policy making authority.

Plaintiff responds that it does not have to prove that defendants Anderson, Bedell or Stewart have final policymaking authority because Plaintiff seeks liability against them in their *individual* capacities. Plaintiff points out that the plaintiff in *City of Idabel* had abandoned his individual capacity claim against the mayor.

Defendants reply that the doctrine of qualified immunity shields them from liability in their individual capacities.

Plaintiff's surreply asserts that to overcome the defense of qualified immunity, Plaintiff need only show that the statutory standard was clearly established. Plaintiff argues that it does not need to provide any prior case law holding an individual defendant liable for money damages

for alleged AACWA violations. Plaintiff also argues that the evidence supports an inference that the defendants violated the AACWA intentionally, and therefore monetary damages are appropriate.

Plaintiff's response indicates that it has abandoned its AACWA claim against the defendants in their official capacities.

Qualified immunity shields the defendants from individual liability, unless Plaintiff overcomes that defense by showing that a reasonable trier of fact could find a legal violation and that the legal duty was clearly established at the time of the alleged violation.

To show the law was clearly established, Plaintiff cites only the language of the AACWA provisions alleged to have been violated. That is not sufficient. The relevant inquiry is whether existing law would have alerted the defendant to the unlawfulness of her actions. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that duty."). For a right to be clearly established generally "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Tonkovich v. Kansas Board of Regents*, 159 F.3d 504, 516 (10th Cir. 1998). The facts of these decisions need not be identical, but the legal authority must provide sufficient notice for a reasonable official to understand what was required under the circumstances. *See Green v. Post*, 574 F.3d 1294, 1300 (10th Cir. 2009). The AACWA provisions upon which Plaintiff relies do not do that.

## CONCLUSION

Summary judgment shall be granted in favor of Defendants on Plaintiff's third claim for alleged violations of § 671(a)(10) and § 671(a)(16) of the Adoption Assistance and Child Welfare Act on the ground that those statutory provisions do not create rights enforceable under 42 U.S.C. § 1983. Alternatively, if those provisions create enforceable rights, the available remedies do not include monetary damages against the defendants in either their official or individual capacities.

With respect to Plaintiff's Substantive Due Process claims, the record evidence fails to show that the conduct of any defendant constituted a conscience-shocking abdication of professional duties.

To the extent that Plaintiff's constitutional claims against all three defendants are based on their recommendation that Angel be placed in the Bond/White foster home, reasonable jurors could not conclude that when the recommendation was made, the placement posed an obvious danger to Angel. The placement recommendation itself was not such a clear abdication of defendants' professional responsibilities as to shock the conscience. The Plaintiff's first and second claims are dismissed as to defendants Anderson and Bedell because their only participation relates to the placement recommendation. Plaintiff's constitutional claims against defendant Stewart fail as well to the extent they are premised on her participation in the placement recommendation and her testimony at the June 17, 2014 hearing.

Plaintiff's Substantive Due Process claim under the special relationship doctrine also encompasses defendant Stewart's allegedly deficient monitoring of the court-ordered change in placement. The record evidence supports the inference that after Angel began living in the

Bond/White household, defendant Stewart failed to recognize signs that Sydney White's ability to take care of Angel was deteriorating and Angel's heath and safety were becoming jeopardized, but that too was not such a clear abdication of her professional responsibilities as to shock the conscience. Accordingly, it is

ORDERED that defendants' motion for summary judgment (ECF No. 66) is GRANTED. The Clerk shall enter judgment dismissing this civil action and awarding costs to the defendants upon the filing of a bill of costs pursuant to D.C.COLO.LCivR 54.1.

DATED this 26th day of June, 2019.


_s/ John L. Kane_____
SENIOR U.S. DISTRICT JUDGE